<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| KARIM MIKHAIL, <br><br> Plaintiff, <br><br> v. <br><br> AMARIN CORPORATION, PLC, *et al.*, <br><br> Defendants. | Civil Action No. 23-01856 (GC) (JBD) <br><br> **OPINION** |

<u>**CASTNER, District Judge**</u>

This matter comes before the Court upon Defendants Amarin Corporation plc (Amarin plc), Amarin Pharma, Inc. (Amarin Inc.),[1] and Amarin Switzerland GmbH's (Amarin Switzerland) Motion to Dismiss Plaintiff Karim Mikhail's Amended Complaint, under Federal Rules of Civil Procedure (Rules) 12(b)(2) and 12(b)(6). (ECF Nos. 23, 26.)  Plaintiff opposed, and Defendants replied. (ECF Nos. 29, 31.)  The Court has carefully considered the parties' submissions and decides the motion without oral argument pursuant to Rule 78(b) and Local Civil Rule 78.1(b). For the reasons set forth below, and other good cause shown, Defendants' motion is **DENIED** without prejudice, to allow for jurisdictional discovery.

## I.    BACKGROUND

### A.   Factual Background

Plaintiff Mikhail, a New York citizen and resident, sues Defendants Amarin plc, a foreign corporation incorporated in England and Wales, with a principal office in Ireland; Amarin Inc., a

---

[1]      Defendants say that Amarin Inc. is improperly named as Amarin Pharmaceuticals, Inc.

Delaware corporation based in New Jersey; and Amarin Switzerland, a Swiss corporation headquartered in Switzerland.  (ECF No. 23 ¶¶ 1-4.)  Mikhail seeks unpaid compensation under two agreements: *first*, his Contract of Employment with Amarin Switzerland, and *second*, Amarin plc's Executive Severance and Change of Control Plan.  (*Id.* ¶¶ 7, 12; ECF No. 26-5 (Employment Agreement); ECF No. 26-6 (Severance Plan).)[2]

       1.    <u>The Agreements</u>

The Employment Agreement, which is governed by Swiss law, details Mikhail's appointment as "Chief Executive Officer ('CEO') of the Company," as "President and CEO of Amarin Corporation plc," and to "the Board of Directors of Amarin Corporation plc."  (ECF No. 26-5 §§ 2.2, 2.3, 2.6.)  In those capacities, Mikhail agreed to "faithfully and diligently perform such job duties and exercise such powers in relation to the Company and the business of the Group."  (*Id.* § 3.1(a).)  The *Company*, as used in the Employment Agreement, means Amarin Switzerland, including "any person acting on behalf of the Company within his proper authority." (*Id.* at 2, § 1.2.)  The *Group* means "the Company and its associated companies."  (*Id.* § 1.1.)  And *associated companies* includes "Amarin Pharmaceuticals Ireland Ltd, Amarin Corporation plc and Amarin Pharmaceuticals Inc."  (*Id.* § 1.1.)

Mikhail alleges that Amarin plc's Severance Plan is incorporated into section 18 of the Employment Agreement,[3] which provides that "[t]he Executive will be eligible for severance pay

---

[2]     Documents "integral to or explicitly relied upon in the complaint," such as the employment and compensation agreements that Mikhail asserts, "may be considered without converting the motion to dismiss into one for summary judgment."  *Doe v. Univ. of Scis.*, 961 F.3d 203, 208 (3d Cir. 2020) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)).

[3]     Defendants contend that "the Employment Agreement incorporates by reference the severance provisions from the Severance Plan."  (ECF No. 26-1 at 13.)  Defendants assert, however, that "[t]his severance obligation is owed by Amarin Switzerland, not by Amarin plc or Amarin Inc.—which are not parties to the Employment Agreement."  (ECF No. 26-1 at 13.)

and benefits under terms and conditions that are no less favourable than pursuant to Amarin Corporation plc's Executive Severance and Change of Control Plan . . . ."  (ECF No. 23 ¶ 12; ECF No. 26-5 § 18.7.)

The Severance Plan establishes "the conditions under which Eligible Executives will receive severance pay and benefits if employment with the Company (or its successor, following a Change of Control) terminates under" specific circumstances.  (ECF No. 26-6 § 1.)  For one, the employee must be an *Eligible Executive*: a "United States employee of the Company or any of its Subsidiaries at the level of Vice President or above at the time of the Date of Termination (or, if applicable, at the time of a Change of Control)."  (*Id.* § 2(n).)  Another condition is a *Change of Control*, which the contract provides may occur in any of several listed events whose common thread is "a 'change in the ownership or effective control' of the Company or a 'change in the ownership of a substantial portion of the Company's assets' for purposes of Section 409A of the [Internal Revenue] Code."  (*Id.* § 2(e).)  And *Control* means "the ownership of more than 50 percent of the issued share capital or other equity interest of the Company or the legal power to direct or cause the direction of the general management and policies of the Company."  (*Id.* § 2(k).)

To be eligible for severance payments and benefits, the Eligible Executive must terminate employment for "Good Reason" within 24 months after the Change of Control.  (*Id.* §§ 2(f), 2(g), 4(a).)  A *Good Reason* includes, for instance, "a material diminution in the Eligible Executive's authority, duties or responsibilities" or "a material breach by the Company of an Employment Agreement."  (*Id.* § 2(o).)  Pursuant to section 18.4 of the Employment Agreement, "[t]ermination with immediate effect for a justified cause pursuant to Article 337 Swiss Code of Obligations (CO/OR) is reserved."  (*Id.* § 18.4.)

The Employment Agreement also provides for accelerated vesting of certain equity awards "upon a Change of Control" as defined in Amarin plc's 2020 Stock Incentive Plan.  (ECF No. 23 ¶ 63; ECF No. 26-5 § 9.1.)  Under the Stock Incentive Plan, a *Change of Control* occurs when "any person or company (either alone or together with any person or company acting in concert with him or it) . . . obtain[s] Control of the Company."  (ECF No. 26-7 § 7(a)(i).)  *Control* means "the ownership of more than fifty (50)% of the issued share capital or other equity interest of the Company."  (*Id.* § 2(o).)  And there, the *Company* means Amarin plc.  (*Id.* § 2(*l*).)

2.    The Alleged Change of Control

Mikhail alleges that a Change of Control occurred after Amarin plc's largest shareholder, Sarissa Capital Management LP, a Connecticut-based hedge fund, initiated and on February 28, 2023, won a proxy contest to add seven of Sarissa's nominees as members to Amarin plc's board, expanding the board from eight to 15 members.  (ECF No. 23 ¶¶ 72, 89-110.)  Immediately after, Mikhail alleges, the Sarissa nominees "bullied the remaining Amarin board members," including Mikhail, "to resign from the Board."  (*Id.* ¶¶ 112-118.)

During a March 6 meeting at Sarissa's offices in Greenwich, Connecticut, between Mikhail and Odysseas Kostas, a Sarissa-nominated board member, Mikhail conveyed that based on Sarissa's proxy campaign, Mikhail "was fired already publicly more than 3 times" and the "new Board had already decided to terminate him."  (*Id.* ¶¶ 119-122.)  Mikhail explained that his "transition out of the company" would require a resolution and that, as for his compensation, he wanted only the severance package under his contract.  (*Id.* ¶¶ 123-124.)  That same day, Amarin plc announced that "all seven independent non-Sarissa board members . . . will resign from the Board of Directors, effective immediately," adding that the members were "stepping down to allow Sarissa, as it has requested, to gain immediate control of the Company."  (*Id.* ¶ 127 (emphasis

omitted).)[4]  In consequence of Sarissa's control of the board, Mikhail alleges, Sarissa "gained full and absolute control of Amarin" and "substantially all of its assets and equity."  (*Id.* ¶ 129.)

On March 9, following the new board's townhall in Bridgewater, New Jersey, Kostas told Mikhail that the board was not interested in a short-term transition, adding that Mikhail should "just resign" if he wanted to leave.  (*Id.* ¶ 133.)

Mikhail alleges that on March 14, he wrote to "Defendant Amarin," "setting forth such facts and seeking a resolution in good faith with the company."  (*Id.* ¶ 134.)  In response, the company's outside counsel asked if Mikhail had resigned, without addressing the substance of Mikhail's communication.  (*Id.* ¶ 135.)  On March 20, Mikhail's counsel tried again to reach a resolution but received no response.  (*Id.* ¶ 136.)

On top of Sarissa's proxy campaign, Sarissa used its effective control of the board to materially diminish Mikhail's duties and responsibilities as a board member and President and CEO.  (*Id.* ¶¶ 137-151.)  On March 27, following a series of acts by new board members undermining his positions as CEO and board member, Mikhail notified the board of his "constructive termination from Defendant Amarin."  (*Id.* ¶ 155.)  Mikhail wrote that "justified cause" under Article 337 of the Swiss Code of Obligations existed for termination, as required to trigger section 18.4 of the Employment Agreement.  He also wrote that a Change of Control occurred under the Severance Plan, given that a Change of Control event had occurred under section 7(a)(i) of the Stock Incentive Plan[5] and that Good Reason existed under section 2(o) of the

---

[4]    *Available at* https://amarincorp.com/news-and-media/amarin-announces-board-departures.  Courts reviewing a motion to dismiss may consider, among other things, documents incorporated into the complaint by reference.  *See Winer Fam. Tr. v. Queen*, 503 F.3d 319, 327 (3d Cir. 2007).

[5]    Defendants contest that the *Change of Control* definition in the Stock Incentive Plan applies to the Severance Plan.  (ECF No. 26-1 at 14.)

Severance Plan.  (*Id.*)  "The reasons supporting Amarin's breach of the Agreement, and the Change of Control Plan," he added, "are more fully set forth in my March 14 and 20, 2023 letters."  (*Id.*)

### B.    Procedural History

On March 31, 2023, Mikhail sued Defendants in the Superior Court of New Jersey, Somerset County.  (ECF No. 1-1.)  Shortly after, Defendants removed the case to this Court.  (ECF No. 1.)  Mikhail did not seek to remand the case and eventually amended his complaint.[6]  (ECF Nos. 8, 23.)

The Amended Complaint asserts three contract-based claims: breach of the Employment Agreement (Count One); breach of the Severance Plan (Count Two); and breach of the covenant of good faith and fair dealing under the Severance Plan (Count Three).  (ECF No. 23 ¶¶ 156-191.)

Defendants' motion to dismiss followed.  Defendants argue that this Court lacks personal jurisdiction over Amarin plc and Amarin Switzerland and, even so, Mikhail has no claim against any Amarin entity.

## II.    LEGAL STANDARDS

### A.    Rule 12(b)(2) – Personal Jurisdiction

For purposes of a motion to dismiss pursuant to Rule 12(b)(2), "the plaintiff must sustain its burden of proof in establishing jurisdictional facts through sworn affidavits or other competent

---

[6]    In so removing, Defendants submitted that because Amarin Inc., the only defendant alleged to be a New Jersey citizen, had yet been served, the "forum-defendant rule" did not preclude the removal. (ECF No. 1 ¶ 4.)  *See* 28 U.S.C. § 1441(b)(2) ("A civil action otherwise removable solely on the basis of the jurisdiction under section 1332(a) of this title may not be removed if any of the parties in interest *properly joined and served* as defendants is a citizen of the State in which such action is brought." (emphasis added)).  Even if the rule did apply, Mikhail is too late to oppose removal on that basis.  *See Encompass Ins. Co. v. Stone Mansion Rest. Inc.*, 902 F.3d 147, 152 (3d Cir. 2018) ("[T]he forum defendant rule is procedural rather than jurisdictional, except where the case could not initially have been filed in federal court." (citations and quotation marks omitted)).  This Court has subject-matter jurisdiction under 28 U.S.C. § 1332.

evidence . . . , not mere allegations." *Patterson v. F.B.I.*, 893 F.2d 595, 604 (3d Cir. 1990) (citation omitted); *see Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009) (describing plaintiff's burden to prove that jurisdiction exists).  When the district court does not hold an evidentiary hearing, "the plaintiff need only establish a prima facie case of personal jurisdiction and the plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor." *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004) (citation omitted).  If the plaintiff meets this burden, "the burden shifts to the defendant to establish the presence of other considerations that would render the exercise of personal jurisdiction unreasonable." *Brainbuilders LLC v. EmblemHealth, Inc.*, Civ. No. 20-12703, 2021 WL 2025004, at *3 (D.N.J. May 21, 2021) (quoting *Display Works, LLC v. Bartley*, 182 F. Supp. 3d 166, 172 (D.N.J. 2016)).[7]

### B.   Rule 12(b)(6) – Failure to State a Claim

On a motion to dismiss for failure to state a claim upon which relief can be granted, courts "accept the factual allegations in the complaint as true, draw all reasonable inferences in favor of the plaintiff, and assess whether the complaint and the exhibits attached to it 'contain enough facts to state a claim to relief that is plausible on its face.'" *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131, 140 (3d Cir. 2023) (quoting *Watters v. Bd. of Sch. Directors of Scranton*, 975 F.3d 406, 412 (3d Cir. 2020)).  "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"

---

[7]     To these ends, Mikhail submits a sworn declaration ("Mikhail Decl.") at ECF No. 29-1, and Defendants submit sworn declarations of Aaron Berg ("Berg Decl."), Interim President & CEO for Amarin plc, at ECF No. 26-2; and David Keenan ("Keenan Decl."), Director for Amarin Switzerland, at ECF No. 26-3.  *See Dudhwala v. Choice Hotels Int'l Servs. Corp.*, Civ. No. 22-873, 2022 WL 4300219, at *2, 4 (D.N.J. Sept. 19, 2022) ("When evaluating a motion to dismiss for lack of personal jurisdiction, courts may consider facts outside of the complaint," including "parties' declarations for relevant factual support" (citing *Patterson by Patterson v. F.B.I.*, 893 F.2d 595, 603-04 (3d Cir. 1990))).

*Clark v. Coupe*, 55 F.4th 167, 178 (3d Cir. 2022) (quoting *Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 372 (3d Cir. 2019)).  When assessing the factual allegations in a complaint, courts "disregard legal conclusions and recitals of the elements of a cause of action that are supported only by mere conclusory statements."  *Wilson*, 57 F.4th at 140 (citing *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 904 (3d Cir. 2021)).  The defendant bringing a Rule 12(b)(6) motion bears the burden of "showing that a complaint fails to state a claim."  *In re Plavix Mktg., Sales Pracs. & Prod. Liab. Litig. (No. II)*, 974 F.3d 228, 231 (3d Cir. 2020) (citing *Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016)).

## III.   DISCUSSION

### A.   Personal Jurisdiction

The United States Constitution provides two ways to establish personal jurisdiction: general (i.e., "all-purpose") and specific (i.e., "case-linked").  *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*, 582 U.S. 255, 262 (2017); *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).  Defendants argue that Amarin Switzerland and Amarin plc are not subject to either form of jurisdiction in New Jersey.

#### 1.   General Personal Jurisdiction

A court may assert general jurisdiction over a foreign entity whose "affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Goodyear*, 564 U.S. at 919.  "For a corporate defendant, the main bases for general jurisdiction are (1) the place of incorporation [or formation]; and (2) the principal place of business." *Castillero v. Xtend Healthcare, LLC*, Civ. No. 22-02099, 2023 WL 8253049, at *5 (D.N.J. Nov. 29, 2023) (quoting *Display Works, LLC v. Bartley*, 182 F. Supp. 3d 166, 173 (D.N.J. 2016)). General jurisdiction may also arise in the "exceptional case" where the entity's "operations in a

forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in that State." *Bullard v. Jaguar Land Rover Auto. PLC*, Civ. No. 20-14464, 2023 WL 4841610, at *3 (D.N.J. July 28, 2023) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 139 n.19 (2014)).

Neither Amarin plc nor Amarin Switzerland satisfies the main bases for general personal jurisdiction in New Jersey. Amarin plc is an English and Welsh corporation headquartered in Ireland; Amarin Switzerland is a Swiss corporation headquartered in Switzerland. (ECF No. 23 ¶¶ 2, 4; ECF No. 26-2 ¶ 3; ECF No. 26-3 ¶ 3.) Mikhail argues that this is an "exceptional case" where Amarin plc's and Amarin Switzerland's operations are so intertwined with Amarin Inc.'s that "these entities functionally are one." (ECF No. 29 at 15.) Mikhail invokes the "alter ego" theory of general personal jurisdiction to try to impute Amgen Inc.'s New Jersey contacts onto Amarin plc and Amarin Switzerland.[8]

Generally, the "use of a subsidiary does not necessarily subject the parent corporation to the jurisdiction." *In re Bulk [Extruded] Graphite Prod. Antitrust Litig.*, Civ. No. 02-6030, 2004 WL 7338471, at *5 (D.N.J. Oct. 28, 2004) (quoting *Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333, 336 (1925)).[9] The Third Circuit Court of Appeals has held, however, that "if a subsidiary is merely the agent of a parent corporation, or if the parent corporation otherwise 'controls' the subsidiary, then personal jurisdiction exists over the parent whenever personal jurisdiction

---

[8]   (*See* ECF No. 29 at 16 ("The entities within the Amarin Group are not 'legally and factually separate' as Defendants make them out to be -- they are all merely functional alter egos that have been organized specifically to attempt to destroy U.S. jurisdictional reach.").)

[9]   *See Rickman v. BMW of N. Am. LLC*, 538 F. Supp. 3d 429, 436-37 (D.N.J. 2021) ("[E]ven if [a] subsidiary is 'at home' in the forum, its parent is not automatically and equally subject to *general* jurisdiction there" (citing *Daimler AG*, 571 U.S. at 136)); *Bullard*, 2023 WL 4841610, at *4 (noting the "strong presumption against attributing a subsidiary's forum contacts to its corporate parent" (quoting *Seltzer v. I.C. Optics, Ltd.*, 339 F. Supp. 2d 601, 613 (D.N.J. 2004))).

(whether general or specific) exists over the subsidiary." *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 781 (3d Cir. 2018) (citations omitted).[10]

This alter-ego theory derives from New Jersey's veil-piercing doctrine, requiring the jurisdiction-proponent to show the following two elements:

> (1) the subsidiary was an alter ego or the parent so dominated the subsidiary that it had no separate existence but was merely a conduit for the parent and (2) the parent has abused the privilege of incorporation by using the subsidiary to perpetrate a fraud or injustice, or otherwise circumvent the law.
>
> [*Bullard*, 2023 WL 4841610, at *4 (citation and quotation marks omitted).[11]]

In deciding whether a subsidiary was "merely a conduit for the parent," courts consider various factors — for instance, the "failure to observe corporate formalities, gross undercapitalization, absence of corporate records, siphoning of funds of the corporation, and the corporation's existence as a facade for the operations of the dominant stockholder." *Napoli v. First Choice Loan Servs., Inc.*, Civ. No. 19-7265, 2020 WL 39148, at *5 (D.N.J. Jan. 3, 2020).

---

[10] Some courts in this Circuit question whether an agency theory, as opposed to the alter-ego theory, survived the United States Supreme Court's holding in *Daimler*, "which disfavored an agency approach to general jurisdiction." *Rickman*, 538 F. Supp. 3d at 437 (collecting cases interpreting *Daimler* as voiding an "agency approach for imputing contacts for the purpose of general jurisdiction"); *see Bullard*, 2023 WL 4841610, at *4 (noting that the agency theory of general personal jurisdiction is "currently suspect" (quoting *Rickman*, 538 F. Supp. 3d at 438 n.4)). For specific general jurisdiction, however, the agency theory is alive. *See Rickman*, 538 F. Supp. 3d at 438 n.4 ("Agency theories remain relevant to purposeful availment."). But Mikhail did not invoke an agency theory, so the Court will not address it.

[11] *See Transportation Insurance Co. v. Am. Harvest Baking Co., Inc.*, Civ. No. 15-663, 2015 WL 9049273, at *4 (D.N.J. Dec. 16, 2015) ("The determination of jurisdiction over a nonresident parent corporation by means of the acts of the subsidiary is a matter of state law." (citing *Alexander v. CIGNA Corp.*, 991 F. Supp. 427, 443 n.25 (D.N.J.), *aff'd*, 172 F.3d 859 (3d Cir. 1998))); *Naty Samra, Min Plast, S.A. de C.V. v. Rehrig Pac. Co.*, 2018 WL 2049269, at *2 (N.J. Super. Ct. App. Div. May 3, 2018) ("The alter ego theory of jurisdiction is founded on the piercing of the corporate veil doctrine." (citing *FDASmart, Inc. v. Dishman Pharms. & Chemicals Ltd.*, 152 A.3d 948, 953 (N.J. Super. Ct. App. Div. 2016))).

Other factors include "who the subsidiary does business with other than the parent;" "the day-to-day involvement of the parent's directors, officers and personnel with the subsidiary;" and "the payment of the subsidiary's salaries and expenses by the parent." *Laverty v. Cox Enterprises, Inc.*, Civ. No. 18-1323, 2019 WL 351905, at *4 (D.N.J. Jan. 29, 2019) (quoting *Seltzer*, 339 F. Supp. 2d at 610); *see also Horowitz v. AT&T Inc.*, Civ. No. 17-4827, 2018 WL 1942525, at *8 (D.N.J. Apr. 25, 2018) (citing *Dewey v. Volkswagen AG*, 558 F. Supp. 2d 505, 513 (D.N.J. 2008), for additional factors). In all events, "for personal jurisdiction, the Court avoids any 'bright-line test.'" *Rickman*, 538 F. Supp. 3d at 437 (quoting *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 320 (3d Cir. 2007))).

For his alter-ego theory, Mikhail first argues that he was the "global CEO" for the three Amarin entities, including all United States operations, according to the Employment Agreement. (ECF No. 29 at 12-13; Mikhail Decl. ¶ 3.) Mikhail asserts that the Amarin entities are collectively wrapped into the terms the *Company*, which means Amarin Switzerland but could include "its subsidiaries and associated companies" or "any person acting on behalf of the Company within his proper authority"; the *Group*, which means "the Company and its associated companies"; and *associated companies*, which the agreement provides "shall include" Amarin plc and Amarin Inc. (ECF No. 29 at 13; ECF No. 26-5 at 2-3, §§ 1.1, 1.2.) Mikhail also asserts that the Employment Agreement, although making Switzerland his "normal place of work," contemplates that his duties "in relation to the Company and the business of the Group" would require him "to travel to work at such other Group locations . . . , including . . . the USA." (ECF No. 29 at 13-14; ECF No. 26-5 §§ 3, 5.) Taken together, Mikhail says, the employment terms make clear that he was hired to oversee the business of all Amarin entities. (ECF No. 29 at 13.)

Defendants contest that Mikhail's service as CEO establishes general personal jurisdiction. (ECF No. 31 at 4.)  They emphasize that Mikhail does not dispute that as CEO, he was based in Switzerland and resided in an apartment that Amarin Switzerland leased for him.  (*Id.*; *see* Keenan Decl. ¶ 5; Berg Decl. ¶ 5.)  They also highlight that Mikhail claims to have "spent less than one-third of 2021 and less than one-fifth of 2022 working in New Jersey."  (ECF No. 31 at 4 (citing Mikhail Decl. ¶ 22).)  Defendants contend that Mikhail's supervision over Amarin Switzerland and Amarin plc from New Jersey part-time "does not mean that either engages in continuous and systematic activities in this forum."  (*Id.*)

Mikhail next argues that Amarin plc's "primary office" is, in fact, the office space in New Jersey where Amarin Inc. operates.  (Mikhail Decl. ¶ 9.)  He points to Amarin plc's SEC filings, which he says conflate the Amarin entities, particularly as to the lease for the Bridgewater office space.  In the SEC filings, Amarin plc reported that "we entered into a lease agreement for . . . office space in Bridgewater, New Jersey," even though the lease names Amarin Inc. as the tenant and Amarin plc as a guarantor of Amarin Inc.'s obligations.  (ECF No. 29 at 14-15; Mikhail Decl. ¶ 11; ECF No. 29-3 at 1; ECF No. 29-2 at 71, 105, 149, Form 10-K, Ex. 10.42.)  Mikhail attributes the discrepancy between the lease provisions and SEC filings to "the interchangeable use of [Amarin plc] and [Amarin Inc.,] because functionally [Amarin Inc.] was effectively acting as the parent entity for the Amarin Group in the U.S."  (Mikhail Decl. ¶ 11.)

Defendants counter that Amarin plc's SEC filings are merely presented on a consolidated basis and do not support that Amarin plc leases New Jersey office space.  (ECF No. 31 at 5-6; *see* ECF No. 29-2 at 6 ("References in this Annual Report on Form 10-K to 'Amarin,' the 'Company,' 'we,' 'our' and 'us' refer to Amarin Corporation plc and its subsidiaries, on a consolidated basis, unless otherwise indicated.").)  On this point, the Court agrees.  The consolidated filings reflect

common ownership, which is relevant but not alone enough for veil-piercing purposes.  *See High 5 Games, LLC v. Marks*, Civ. No. 03-7161, 2019 WL 3761114, at *6 (D.N.J. Aug. 9, 2019) (filing consolidated financial statements, referring to subsidiaries as "controlled entities," a website shared with subsidiaries, and common leadership with subsidiaries merely reflects common ownership and management insufficient for veil piercing).[12]

Mikhail next argues that although the Amarin entities are organized with Amarin plc as the parent of Amarin Inc. and Amarin Switzerland, Amarin Inc. is the heart of the group's business. Mikhail asserts that "almost all of Amarin Group's global income is generated by [Amarin Inc.] . . . in the U.S. market." (Mikhail Decl. ¶ 14.)  Amarin plc, Mikhail says, generates no revenue; "it only generates limited costs, mostly in the form of the non-executive board's compensation." (*Id.* ¶ 13.)  And Amarin Switzerland, created in 2021 to be the group's European commercial headquarters, "organizationally and functionally" sits below and reports up to Amarin Inc. (*Id.* ¶ 5.)  In fact, Mikhail says, "the Amarin Group is effectively entirely operated through [Amarin Inc.] and its global headquarters in Bridgewater, New Jersey"; "[t]he oversight of [Amarin Switzerland] flows through [Amarin Inc.] and takes place in New Jersey"; and "[e]very key operation and business metric for the Amarin Group is centered around [Amarin Inc.] in New Jersey." (ECF No. 29 at 16.)

---

[12]   Mikhail also implies, without providing case authority, that Amarin plc's "primary stock market listing in the United States on the NASDAQ Global Market" could support a finding of personal jurisdiction here.  (Mikhail Decl. ¶ 8.)  But at least one other court in this District has found that stock-exchange listings in the United States are not enough to establish general personal jurisdiction.  *See In re Bulk*, 2004 WL 7338471, at *6 ("The listing of SGL AG's securities on the NYSE is not enough to establish jurisdiction, nor are the routine activities such as distribution of dividends or required filings with the SEC that stem from that listing." (citing 69A Am. Our. 2d *Securities Regulation – Federal* § 966 (1993))).  This Court agrees.

The Court first finds that Mikhail, despite all favorable inferences, has not proven general personal jurisdiction over Amarin Switzerland.[13]  Defendants assert that Amarin Switzerland has no New Jersey employees or offices, conducts no business in New Jersey, and has its own board of directors and corporate structure.  (Keenan Decl. ¶¶ 4, 6-8.)  Mikhail does not show otherwise. In his declaration, Mikhail swears only that his Employment Agreement was with Amarin Switzerland "on behalf of all Amarin associated companies in the Amarin Group" (Mikhail Decl. ¶ 3); that Amarin Switzerland is "organizationally and functionally" a subsidiary to Amarin Inc., "where the Executive team was based," and Amarin plc (*id.* ¶ 5); and that he spent time working in Bridgewater, New Jersey, "facilitating the business of all Amarin Group entities, including [Amarin Switzerland] and [Amarin plc]" (*id.* ¶ 22).

From these allegations, the Court cannot infer that Amarin Switzerland so dominated Amarin Inc. as to be each other's alter ego.  For one, Mikhail's in-person supervision over the New Jersey operations cannot alone justify veil-piercing.  *See High 5 Games*, 2019 WL 3761114, at *6 ("'[C]ommon ownership and common management alone' are insufficient for veil-piercing purposes." (quoting *Linus Holding Corp. v. Mark Line Indus., LLC*, 376 F. Supp. 3d 417, 427 (D.N.J. 2019))); *see also Transportation Insuance*, 2015 WL 9049273, at *4 (noting the "well established principle of corporate law that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership" (quoting *United States v. Bestfoods*, 524 U.S. 51, 69 (1998))).  For another, Mikhail's conclusory statement that Amarin Switzerland is "organizationally and

---

[13]     Because the Court does not assert general personal jurisdiction over Amarin Switzerland, it need not address Defendants' argument that the alter-ego theory cannot be used to impute a subsidiary's jurisdictional contacts onto a fellow subsidiary rather than a parent.

functionally" a subsidiary to Amarin Inc. is not the type of "competent evidence" needed to prove that general personal jurisdiction is proper. *See Metcalfe*, 566 F.3d at 330.

As to Amarin plc, Mikhail's allegations — which, again, the Court takes as true — demonstrate that considerable overlap between Amarin plc's and Amarin Inc.'s personnel existed while he was CEO. Mikhail declares, for instance, that all of Amarin plc's officers, except for him, "have been based in New Jersey and paid on the New Jersey payroll." (Mikhail Decl. ¶ 20.) In fact, though Defendants deny that Amarin plc conducts business in New Jersey, they agree that certain Amarin plc employees work from New Jersey. (Berg Decl. ¶¶ 5, 7.) Still, sharing personnel and office space does not rise to the level of control that justifies veil-piercing for general personal jurisdiction. *See Seltzer*, 339 F. Supp. 2d at 610 ("A significant degree of overlap between directors and officers of a parent and its subsidiary does not establish an alter ego relationship." (citation omitted)); *Laverty*, 2019 WL 351905, at *3 (collecting cases finding the presence of employees in New Jersey insufficient to confer general personal jurisdiction).

Even if Mikhail's allegations concerning Amarin plc and Amarin Switzerland established the control element of the veil-piercing doctrine, Mikhail has not established the second element: that Amarin plc or Amarin Switzerland "abused the privilege of incorporation by using the subsidiary to perpetrate a fraud or injustice, or otherwise circumvent the law." *Bullard*, 2023 WL 4841610, at *4. Mikhail argues that the three Amarin entities are "merely functional alter egos . . . organized specifically to attempt to destroy U.S. jurisdictional reach." (ECF No. 29 at 16.) But Mikhail's declaration states that Amarin plc's board and Mikhail "mutually decided" that his Employment Agreement would be with Amarin Switzerland because (1) "it was beneficial to the Amarin Group for the CEO to be contracted outside of the United States in case of a U.S. business collapse caused by generic entrants," and (2) "COVID-19 protocols made it difficult for United

15

States employees to freely travel to Europe in 2021 at the time [Mikhail] became CEO." (Mikhail Decl. ¶ 4.)  On those allegations, the Court is not satisfied that Mikhail has shown that "the parent has abused the privilege of incorporation by using the subsidiary to perpetrate a fraud or injustice, or otherwise circumvent the law," to establish general personal jurisdiction.

### 2.   Specific Personal Jurisdiction

For specific personal jurisdiction, three elements must be met: *first*, the defendant "purposefully directed its activities at the forum"; *second*, the litigation "arise[s] out of or relate[s] to at least one of those activities"; and *third*, the exercise of jurisdiction "comports with fair play and substantial justice." *O'Connor*, 496 F.3d at 317; *Hepp v. Facebook*, 14 F.4th 204, 207 (3d Cir. 2021); *D'Jamoos ex rel. Est. of Weingeroff v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 102 (3d Cir. 2009).  "The defendant need not be physically located in the state while committing the alleged acts." *Al-Ghena Int'l Corp. v. Radwan*, 957 F. Supp. 2d 511, 528 (D.N.J. 2013) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)).  "Nor is specific jurisdiction defeated merely because the bulk of harm occurred outside the forum." *Id.* (citing *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 780 (1984)).

### i.   *Purposeful availment*

As to purposeful availment in breach-of-contract cases, courts consider "prior negotiations" and "contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Control Screening LLC v. Tech. Application & Prod. Co. (Tecapro), HCMC-Vietnam*, 687 F.3d 163, 168 (3d Cir. 2012) (quoting *Burger King*, 471 U.S. at 479); *see Remick v. Manfredy*, 238 F.3d 248, 256 (3d Cir. 2001) ("In determining jurisdiction over a breach of contract claim, we must consider the totality of the circumstances, including the location and character of the contract negotiations, the terms of the contract, and the parties' actual

course of dealing.").  "A single contact that creates a substantial connection with the forum can be sufficient to support the exercise of personal jurisdiction over a defendant."  *Rowland Glob. LLC v. Good Clean Love, Inc.*, Civ. No. 15-5738, 2016 WL 952339, at *4 (D.N.J. Mar. 14, 2016) (citing *Burger King*, 471 U.S. at 475 n.18).  "Actual presence during pre-contractual negotiations, performance, and resolution of post-contract difficulties is generally factored into the jurisdictional determination."  *Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144, 150 (3d Cir. 2001) (citing *Remick*, 238 F.3d at 255-56).

Mikhail has demonstrated that Amarin plc and Amarin Switzerland directed their activities at New Jersey.  In his declaration, Mikhail submits that nine of his 12 direct reports are based in the New Jersey office.  (Mikhail Decl. ¶ 18.)  He adds that all of Amarin plc's officers, except for him, "have been based in New Jersey and paid on New Jersey payroll," including two former CEOs "who spent their entire tenure working from the New Jersey headquarters."  (Mikhail Decl. ¶ 20.)  Mikhail, who Defendants allege was an Amarin Switzerland employee (Berg Decl. ¶ 5), also spent "120 days in 2021 and 70 days in 2022 working out of" the New Jersey office, "facilitating the business of all Amarin Group entities" (Mikhail Decl. ¶ 22.)  And while Mikhail was CEO, all six quarterly earnings calls concerning "all Amarin Group entities" were led from the New Jersey office, and the Amarin entities held at least 13 in-person "Global TownHall" and "CEO Breakfast" employee meetings concerning "all Amarin Group entities" at the New Jersey office.  (Mikhail Decl. ¶¶ 21, 23.)  Defendants do not meaningfully contest these allegations as they concern purposeful availment.  The Court is therefore satisfied that Mikhail clears the first hurdle of the inquiry.  *See Palladino v. Leavitt*, Civ. No. 22-6756, 2023 WL 6366095, at *4 (D.N.J. Sept. 29, 2023) ("[P]hysical entry into the State—either by the defendant in person or through an

agent, goods, mail, or some other means—is certainly a relevant contact." (quoting *Walden v. Fiore*, 571 U.S. 277, 285 (2014))).

> ii.      *Arises out of or relates to*

Next, the Court considers whether the claims arise out of or relate to the activities directed at the forum.   In contract cases, the defendant's contacts with the forum must have been "instrumental in either the formation of the contract or its breach."   *O'Connor*, 496 F.3d at 320 (quoting *Gen. Elec.*, 270 F.3d at 150); *see Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prod. Co.*, 75 F.3d 147, 153 (3d Cir. 1996) (stating that only "dealings between the parties in regard to the disputed contract, not dealings unrelated to the cause of action," are relevant to the minimum contacts analysis).

Mikhail alleges that Sarissa, "through its . . . effective control of Amarin's Board, . . . directed the material diminution of his duties and responsibilities as a board member and the President and CEO of the company."  (ECF No. 23 ¶ 137.)  Those duties and responsibilities (1) related to "the Company and the business of the Group," which centered on Amarin Inc. in New Jersey, the heart of the group's business, and (2) required Mikhail to travel to New Jersey.  (ECF No. 26-5 at 2 §§ 1.1, 3.1(a), 5.)  So Mikhail says the breach — Defendants' material diminution of Mikhail's duties and responsibilities — must have arisen out of or related to Defendants' business in New Jersey.

For Amarin plc, Mikhail's case for specific personal jurisdiction is convincing.  Mikhail served as a board member and President and CEO of Amarin plc.  As such, he attended the March 9 Global TownHall in Bridgewater, New Jersey, held in person and attended by Amarin plc's new board members.  (Mikhail Decl. ¶ 23.)  Mikhail alleges that at that meeting, a Sarissa-nominated board member told Mikhail that the board was not interested in a short-term transition and that if

he wished to resign, he should "just resign."  (ECF No. 23 ¶ 133; Mikhail Decl. ¶ 24.)  Mikhail claims that this encounter was instrumental to his constructive termination.  (ECF No. 23 ¶ 39.)

Defendants counter that before that meeting, Mikhail had conveyed that he considered himself "fired already publicly" and wished "to transition out of the company."  (ECF No. 31 at 8 (quoting ECF No. 23 ¶¶ 119-124).)  But at this stage, Mikhail enjoys all favorable inferences and a "relatively light" burden.  *See Rickman*, 538 F. Supp. 3d at 438 ("At this pre-discovery juncture, I construe any factual disputes in Plaintiffs' favor, and Plaintiffs' burden is relatively light." (citation omitted)).  Minding that low standard, the Court finds that the March 9 meeting was sufficiently instrumental to the alleged breach for Amarin plc to be subjected to specific personal jurisdiction here.

As to Amarin Switzerland, Mikhail's evidence is less direct.  Mikhail alleges that "Defendant Amarin" froze him out of the company's decision-making.  (ECF No. 23 ¶ 138.)  In support, he gives several examples of "conduct by Amarin's new Board" "divesting him of his responsibilities at Amarin" and "communicating with [his] team members without his knowledge." (*See id.* ¶¶ 138-151.)  But Mikhail's evidence does not clarify whether any Amarin Switzerland representative participated in the actionable conduct or, if one so participated, to what extent the conduct related to Mikhail's duties and responsibilities in New Jersey.  Indeed, as Defendants note, Mikhail does not allege that Kostas was speaking for Amarin Switzerland rather than Sarissa, or that Amarin Switzerland breached the Employment Agreement as a result.  (ECF No. 31 at 8.) And although Mikhail's complaint identifies two March 2023 letters describing "[t]he reasons supporting Amarin's breach of the Agreement, and the Change of Control Plan" (ECF No. 23 ¶ 155), neither side submitted those letters to the Court.

That said, Mikhail's allegations suggest "with reasonable particularity" that the requisite related contacts between Amarin Switzerland and New Jersey occurred, such that the Court would benefit from limited jurisdictional discovery.  *See Malik v. Cabot Oil & Gas Corp.*, 710 F. App'x 561, 565 (3d Cir. 2017).  "[J]urisdictional discovery should be allowed unless the plaintiff's claim is 'clearly frivolous.'"  *Massachusetts Sch. of L. at Andover, Inc. v. Am. Bar Ass'n*, 107 F.3d 1026, 1042 (3d Cir. 1997) (citation omitted); *see also Metcalfe*, 566 F.3d at 336 ("[J]urisdictional discovery particularly appropriate where the defendant is a corporation.").

Here, Mikhail's evidence supports that as Amarin Switzerland's CEO, he spent considerable time focusing on Amarin Inc.'s business in New Jersey.[14]  From that evidence, the Court can infer that the allegedly actionable conduct may have been performed by Amarin Switzerland concerning Mikhail's duties as to New Jersey operations.  At a minimum, Mikhail's specific personal jurisdiction argument is not "clearly frivolous."  *See Caduceus, Inc. v. Univ. Physician Grp.*, Civ. No. 23-3415, --- F.Supp.3d ----, 2024 WL 303845, at *6 (D.N.J. Jan. 26, 2024) (noting the relatively low bar for getting jurisdictional discovery "to avoid unnecessarily reaching abstract constitutional questions").

### iii.  Fair play and substantial justice

As to the third prong, "[t]he existence of minimum contacts makes jurisdiction presumptively constitutional, and the defendant 'must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'"  *O'Connor*, 496 F.3d at 324 (quoting *Burger King*, 471 U.S. at 477).  For this requirement, courts consider (1) "the burden

---

[14]    Jurisdictional discovery may reveal the place where Mikhail "habitually perform[ed]" his work, to which Swiss law confers jurisdiction.  (*See* ECF No. 26-1 at 21 n.6; ECF No. 26-8 at 3 ("The Swiss courts at the defendant's domicile or at the place where the employee habitually performs their work have jurisdiction to hear actions relating to an employment contract.").)

on the defendant," (2) "the forum State's interest in adjudicating the dispute," (3) "the plaintiff's interest in obtaining convenient and effective relief," (4) "the interstate judicial system's interest in obtaining the most efficient resolution of controversies," and (5) "the shared interest of the several States in furthering fundamental substantive social policies." *Bullard*, 2023 WL 4841610, at *6 (quoting *Burger King*, 471 U.S. at 477).

On this prong, Defendants argue only that "none of Amarin plc's alleged contacts with New Jersey relate to Plaintiff's claims under the Severance Plan." (ECF No. 31 at 9; see ECF No. 26-1 at 23.) But since the Court has already found otherwise, the presumption of constitutionality as to Amarin plc is not rebutted. For Amarin Switzerland, the Court will revisit this prong if Defendants move again to dismiss after the parties complete jurisdictional discovery.[15]

## IV.   CONCLUSION

For the reasons set forth above, and other good cause shown, Defendants' Motion to Dismiss (ECF No. 26) is **DENIED** without prejudice to Defendants' right to move again under Rules 12(b)(2) or 12(b)(6) after the parties complete jurisdictional discovery. An appropriate Order follows.

Dated: February 29, 2024

GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE

---

[15]   Because jurisdictional discovery is necessary, and for judicial economy, the Court will deny Defendants' Rule 12(b)(6) motion without prejudice to a renewed motion to dismiss following the limited discovery. If Defendants so move to dismiss claims concerning the Employment Agreement, which the parties agree is governed by Swiss law (*see* ECF No. 23 ¶ 67), Mikhail must provide copies of opinions from Swiss courts, as Defendants did (*see* ECF Nos. 26-4 to 26-14), or explain why the Court should not apply Swiss law.